UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

DEVIN CRAIG,

                    Plaintiff(s),

        v.

PETERSON LAMPS HQ LLC, et al.,

                    Defendant(s).

CASE NO. C25-1252-KKE

ORDER ON DEFENDANTS' MOTION TO DISMISS

Plaintiff Devin Craig sues Defendants Peterson LAMPS HQ LLC ("HQ") and Chad Peterson over a business dispute involving Craig's ouster from an enterprise that the parties formed to provide business broker services in Washington State. Defendants move to dismiss all claims, lodging numerous challenges to the Complaint in what can fairly be characterized as a kitchen sink approach. Among their arguments for dismissal are lack of subject matter jurisdiction, lack of personal jurisdiction, improper venue, release, and failure to state a claim. Defendants also initially sought transfer to the Western District of Missouri but, at oral argument, abandoned that request.

For the following reasons, the Court will deny Defendants' motion in large part and grant it in part. The Court finds that Craig's rescission claim based on fraud, as currently pled, fails to meet Federal Rule of Civil Procedure 9(b)'s heightened pleading standard. The Court also finds that the allegations fail to show that Craig invested in the enterprise at issue expecting to profit

ORDER ON DEFENDANTS' MOTION TO DISMISS - 1

from the efforts of others, as required to establish that he purchased a "security" under state or federal securities law. However, because amending the Complaint would not be futile, the Court dismisses these aspects of the Complaint without prejudice and with leave to amend.

## I.    BACKGROUND[1]

Craig, a resident of King County, Washington, works as a business broker, which is a professional intermediary who facilitates the buying and selling of privately held, typically small businesses. Dkt. No. 1 ¶ 1; *see also* D. Liberto, *What Is a Business Broker?*, INVESTOPEDIA (Dec. 3, 2025), https://www.investopedia.com/terms/b/business-broker.asp. Peterson, an Arizona resident, is also a business broker as well as "the manager" of HQ, a Missouri-based company operating in the business brokerage space. Dkt. No. 1 ¶¶ 2–3. Throughout his Complaint, Craig largely refers to Peterson and HQ collectively as "Defendants" without distinguishing between HQ, Peterson, or other HQ representatives who presumably acted on its behalf. The Court will follow suit in recounting the allegations unless context makes clear the specific person at issue.

In 2022, Craig viewed an online video in which Peterson invited other business brokers to contact him about opportunities to invest in growing Defendants' business by establishing subsidiaries of HQ in other parts of the country. *Id.* ¶¶ 6–8. Craig contacted Defendants, who eventually proposed that Craig become an investor in HQ's "Local Area Marketing Partners" program. *Id.* ¶¶ 9–10.

Under Defendants' proposal, Craig would invest $54,000 with HQ and receive "Class B Convertible Preferred Units" representing a 49% ownership interest in a new subsidiary of HQ, created to do business in Washington. *Id.* ¶ 10. HQ would retain the remaining 51%. *Id.* Craig alleges Defendants told him they would use his investment to advertise the new subsidiary to

---

[1] The Court accepts the allegations in the Complaint as true for purposes of this background section.

ORDER ON DEFENDANTS' MOTION TO DISMISS - 2

potential clients in King County and that Craig would serve as the subsidiary's "Marketing Partner," pursuing leads and closing brokered sales on which Craig would earn a commission. *Id.* ¶¶ 11–14. Craig claims he was promised to make at least "$500,000 per year in" commissions. *Id.* ¶ 15. Defendants also told him that, when Craig was ready to sell his interest in the subsidiary, Defendants would purchase his shares at a price "that matched or exceeded the top valuation rates and EBITDA [earnings before interest, taxes, depreciation, and amortization] multiples found in the industry." *Id.* ¶ 18.

Around the end of 2022, Craig paid the $54,000 investment, and HQ formed Peterson LAMP – WA – King, LLC ("LAMP–WA") as a Missouri-based limited liability company. *Id.* ¶¶ 19, 22; *see also id.* at 45 (Ex. E). Craig then executed several documents executing his purchase of units in LAMP–WA and signed an "MP Consulting Agreement," which generally authorized Craig to collect consulting fees from LAMP–WA. *Id.* ¶¶ 21–24.

For roughly the next two years, Craig worked exclusively for LAMP–WA pursuing business broker leads at the direction of HQ. *Id.* ¶ 26. He alleges that he "secured [LAMP–WA]'s position as a broker" on ten transactions, all of which were set to close between December 2024 and June 2025. *Id.* ¶ 27. Collectively, these transactions would have generated about $1.3 million in commissions, of which Craig would have been entitled to at least $280,000—and potentially as much as $704,250 if every potential lead closed. *Id.* ¶ 28.

In November 2024, however, Defendants informed Craig that the arrangement "was not working out and that they were electing to dissolve" LAMP–WA because "they were not satisfied with [Craig's] work product[.]" *Id.* ¶ 29. When he hesitated to sign a Mutual Dissolution Agreement, Craig alleges Defendants threatened him by stating HQ would not pay him any commissions if he refused to sign and that Defendants would report him to the U.S. Securities and Exchange Commission ("SEC") for criminal investigation regarding "vague nonspecific

ORDER ON DEFENDANTS' MOTION TO DISMISS - 3

wrongdoing." *Id.* ¶¶ 31–32.   Craig further alleges that Defendants told him if he did sign, HQ would "take over" the pending transactions and pay Craig commissions on any that closed. *Id.* ¶ 31.  By this time, Craig had only been paid $17,000 in total for his twenty-three months of work. *Id.* ¶ 30.  Craig alleges he signed the Mutual Dissolution Agreement "under significant duress from Defendants' threats[.]" *Id.* ¶ 33.

After signing, however, Defendants did not dissolve LAMP–WA as promised but, instead, continued to operate it as a business, including by cultivating "business leads that [Craig] had generated[.]" *Id.* ¶ 34.  Craig does not know if Defendants ever counter-signed the Dissolution Agreement. *Id.*  However, Craig alleges Defendants closed many of the transactions that were in progress when he left LAMP–WA and, in doing so, generated substantial revenue on which Craig would have earned commissions had he remained with the company. *Id.* ¶ 35.  In December 2024, Defendants informed Craig they would not pay him any commissions—contrary to what Craig alleges the Dissolution Agreement provided.[2]  *Id.* ¶ 36.  HQ also retained Craig's $54,000 investment and did not pay Craig for his shares in LAMP–WA. *Id.* ¶ 40.  Under the valuation rate set out in LAMP–WA's Operating Agreement, which applies when an "expelled member" is "exceeding performance requirements," Craig claims his shares were "worth no less than $5,508,059." *Id.* ¶¶ 40–41.

In January 2025, Craig "sent Defendants a notice rescinding the Dissolution Agreement[.]" *Id.* ¶ 42.  The rescission was based on Craig's claim that he signed the agreement under duress and was "induced by Defendants' false representations" that they would dissolve the company and pay Craig his share of commissions. *Id.*

---

[2] Craig's Complaint contains a typographical error stating that Defendants informed him they would not pay him commissions in December *2025*. Dkt. No. 1 ¶ 36 (emphasis added).  The Complaint was filed in July 2025, and context makes clear the intended date is December 2024.

In July 2025, Craig filed his Complaint, asserting claims against HQ for rescission of the Mutual Dissolution Agreement, breach of contract, breach of fiduciary duty, and breach of the duty of good faith and fair dealing, and against both HQ and Peterson for securities fraud under both state and federal law. *Id.* ¶¶ 44–115. Defendants moved to dismiss the Complaint (Dkt. No. 14) and Craig filed an opposition (Dkt. No. 16). Defendants did not file a reply. The Court heard oral argument on January 13, 2026 (Dkt. No. 21), and the motion is now ripe for consideration.

## II.    DISCUSSION

Broadly speaking, Defendants move to dismiss for (1) lack of subject matter jurisdiction, (2) lack of personal jurisdiction, (3) improper venue, and (4) failure to state a claim. *See* Fed. R. Civ. P. 12(b)(1), (2), (3), (6).[3] The Court will consider each argument in turn.

### A.    Subject Matter Jurisdiction

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) may be predicated on either a "factual" or "facial" challenge to subject matter jurisdiction. *See Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). While Defendants do not specify the type of challenge they intend to make, their motion articulates a facial challenge because it asserts that the Complaint's factual allegations are insufficient on their face to establish federal jurisdiction. *Id.*; *see* Dkt. No. 14 at 5 (arguing, based on what Craig "affirmatively alleges," that the Court lacks jurisdiction). Moreover, they present no evidence outside the pleadings with which to challenge jurisdiction. District courts resolve facial attacks on jurisdiction as they do motions to dismiss under Rule 12(b)(6): by "[a]ccepting the plaintiff's allegations as true[,]" "drawing all reasonable

---

[3] Their motion also asks the Court to transfer this action to the Western District of Missouri pursuant to 28 U.S.C. § 1404(a). But, at oral argument, defense counsel clarified that Defendants no longer request transfer. Accordingly, the Court will not analyze the transfer factors set out in *Jones v. GNC Franchising, Inc.*, 211 F.3d 495 (9th Cir. 2000).

inferences in the plaintiff's favor[,]" and determining whether the allegations are legally sufficient to invoke jurisdiction. *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014).

One basis for federal subject matter jurisdiction is diversity jurisdiction, which exists only if (1) no defendant is a citizen of the same state as any plaintiff and (2) the amount in controversy exceeds $75,000. 28 U.S.C. § 1332(a). Defendants challenge the existence of both prongs.[4]

First, they contend Craig "was a member of the very LLC [limited liability company] he now sues" such that he shares the same citizenship as the LLC. Dkt. No. 14 at 5. For purposes of diversity jurisdiction, "an LLC is a citizen of every state of which its []members are citizens." *Johnson v. Columbia Props. Anchorage, LP*, 437 F.3d 894, 899 (9th Cir. 2006).

Defendants' argument is without merit. The only LLC in which Craig alleges he was a member is LAMP–WA, which is not a defendant in this case. Defendants cite no authority supporting their suggestion that HQ is somehow "deemed a citizen of the same state as" Craig "by extension" of its status as LAMP–WA's "managing member[.]" Dkt. No. 14 at 5. Defendants' reliance on *Shulman v. Voyou, LLC*, 305 F. Supp. 2d 36 (D.D.C. 2004), is inapposite: There, the plaintiff shared the same citizenship as two members of the LLC he sued, defeating diversity between him and the LLC. *Id.* at 39–40. Here, Craig is a citizen of Washington and Peterson is a citizen of Arizona. Dkt. No. ¶¶ 1, 2. Craig's counsel filed a declaration stating that HQ's members are citizens of Arizona, Missouri, and Colorado. Dkt. No. 18 ¶ 3. Accordingly, there is complete diversity between the parties.

Defendants briefly suggest LAMP–WA might be an indispensable party whose absence requires dismissal under Federal Rule of Civil Procedure 19. Dkt. No. 14 at 5–6. But they make

---

[4] Although Craig also asserts a federal securities fraud claim, potentially establishing federal question jurisdiction under 28 U.S.C. § 1331, for the reasons stated below, the Court will dismiss this claim without prejudice for failure to adequately plead the existence of a "security" under federal law.

ORDER ON DEFENDANTS' MOTION TO DISMISS - 6

no contact with Rule 19's standard—instead simply asserting that Craig's "claims are all derivative of his status as a former member of" LAMP–WA. *Id.* at 6. Defendants fail to explain how LAMP–WA's absence would either prevent the Court from awarding complete relief among existing parties, impair or impede LAMP–WA's ability to protect its interest, or leave an existing party subject to a risk of inconsistent obligations. Fed. R. Civ. P. 19(a)(1). Defendants have therefore not shown that LAMP–WA's absence requires dismissal under Rule 19.

Second, Defendants contend the amount in controversy is less than the $75,000 threshold because Craig's only "concrete sum pled" is the loss of his $54,000 investment. Dkt. No. 14 at 6. Defendants simply misstate the Complaint's allegations. In addition to Craig's investment, the Complaint seeks at least $280,000 against each Defendant in unpaid commissions, among other sums. Dkt. No. 1 ¶¶ 67, 101; *see also id.* at 20–21. And contrary to Defendants' suggestion, Craig alleges this sum represents commissions due on deals that *actually closed*, not those that "may or may not have closed" (Craig claims to be owed another $424,250 on those deals). *Id.* ¶ 28.

Where a plaintiff sues in federal court, "the amount in controversy is determined from the face of the pleadings." *Crum v. Circus Circus Enters.*, 231 F.3d 1129, 1131 (9th Cir. 2000). "To justify dismissal, it must appear to a legal certainty that the claim is really for less than the jurisdictional amount." *Id.* Here, Craig's claims against both Defendants for unpaid commissions are based on the allegations that (a) he was promised commissions on pending sales that closed after his departure from LAMP–WA in exchange for signing the Dissolution Agreement, (b) HQ closed several such deals worth $1,324,500, and (c) Defendants never paid him the commissions he was owed. Dkt. No. 1 ¶ 28. These allegations are neither in bad faith nor legally impossible and are sufficient to establish the requisite amount in controversy at this stage of litigation. Accordingly, there is diversity jurisdiction as to both Defendants.

ORDER ON DEFENDANTS' MOTION TO DISMISS - 7

**B.      Personal Jurisdiction**

Defendants next contend that they lack the required "minimum contacts" with Washington to be constitutionally haled into court here.  Unless a defendant is "essentially at home" in the forum State, personal jurisdiction must be based on the defendant's specific contacts with the State—a form of jurisdiction known as "specific" personal jurisdiction.  *Doe v. Deutsche Lufthansa*, 157 F.4th 1103, 1110 (9th Cir. 2025).  Craig does not contend that HQ or Peterson are "essentially at home" in Washington, so personal jurisdiction—if it exists—must be "specific." *Id.*

Courts in the Ninth Circuit apply a three-prong test to determine if there is specific personal jurisdiction over a claim against a non-resident defendant:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;

> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and

> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004) (citing *Lake v. Lake*, 817 F.2d 1416, 1421 (9th Cir. 1987)).  "The plaintiff bears the burden of satisfying the first two prongs of the test." *Id.*  "If the plaintiff succeeds in satisfying both of the first two prongs, the burden then shifts to the defendant to 'present a compelling case' that the exercise of jurisdiction would not be reasonable." *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476–78 (1985)).

The Complaint easily clears the first prong of the test.  Craig alleges that Defendants purposefully availed themselves of the privilege of doing business in Washington by forming an

ORDER ON DEFENDANTS' MOTION TO DISMISS - 8

enterprise with Craig to provide business brokerage services to Washington clients. Dkt. No. 1 ¶¶ 11, 17, 22. Indeed, the name of the LLC they formed—"Peterson LAMP – WA – King, LLC"— identifies the geographic location they intended to target: King County, Washington. *Id.* ¶ 21. The Complaint also satisfies the second prong because Craig's claims arise directly out of Defendants' Washington contacts: Craig seeks to rescind the agreement dissolving the Washington-focused enterprise, recover damages for broken promises related to the dissolution, and sue for false statements concerning his purchase and surrender of shares in the enterprise. Dkt. No. 1 ¶¶ 44– 115.

Since Craig satisfies the first two prongs of the minimum contacts test, the burden shifts to Defendants to make a compelling showing that exercising jurisdiction would be unreasonable. *Schwarzenegger*, 374 F.3d at 802. Defendants' only arguments on this front are that the "operative agreements" contain choice-of-law clauses selecting Missouri governing law and that the challenged actions by HQ "emanated from HQ's Missouri-based management." Dkt. No. 14 at 7; *see* Dkt. No. 1 at 29 (LAMP–WA Subscription Agreement's choice-of-law clause); *id.* at 38 (same in LAMP Commission Agreement); *id.* at 68 (same in Mutual Dissolution Agreement). Neither argument is persuasive, much less compelling. Courts routinely apply out-of-state governing law. And the fact that Defendants' actions were directed from another state is entirely unexceptional. Indeed, the point of specific personal jurisdiction is to permit defendants to be sued in states where they are not "at home." *See Deutsche Lufthansa*, 157 F.4th at 1110.

In sum, Defendants have sufficient minimum contacts with Washington to support this Court's exercise of personal jurisdiction over them.

**C.   Venue**

Next, Defendants contend that the parties agreed to litigate disputes in Missouri, so the Court should dismiss the case under Federal Rule of Civil Procedure 12(b)(3) for improper venue.

ORDER ON DEFENDANTS' MOTION TO DISMISS - 9

Defendants' argument is unpersuasive because it confuses a choice of law provision (which the parties agreed to) with a forum selection clause (which they did not).

Defendants claim that "[t]he governing agreements between the parties expressly require that disputes be resolved … in Missouri courts." Dkt. No. 14 at 8. For support, they quote the Mutual Dissolution Agreement, which states "[t]his Agreement shall be governed by and construed in accordance with the laws of Jackson County, Missouri." *Id.* at 9; *see* Dkt. No. 1 at 68. "A choice of law provision is not the same as a forum selection clause." *Brilliant Info Corp. v. Moso Power Tech (HK) Int'l Ltd.*, No. CV153090FMOPLAX, 2015 WL 12766589, at *4 (C.D. Cal. Oct. 29, 2015). A choice of law clause—like the one in the Dissolution Agreement—"designate[s] the jurisdiction whose law will govern any disputes that may arise between the parties." *Choice-of-law clause*, Black's Law Dictionary (12th ed. 2024). A forum selection clause, on the other hand, "establish[es] the place (such as the country, state, or type of court) for specified litigation between" the parties. *Forum-selection clause*, Black's Law Dictionary (12th ed. 2024).

That the parties' agreements contain a Missouri choice of law clause "has no bearing on where and what type of forum the parties agreed to resolve any disputes." *Brilliant Info Corp.*, 2015 WL 12766589, at *4. The Court therefore rejects Defendants' improper venue argument.

**D.      Failure to State a Claim**

Defendants also challenge the sufficiency of Craig's allegations under Federal Rule of Civil Procedure 12(b)(6). In evaluating a motion to dismiss under Rule 12(b)(6), a court examines the complaint to determine whether, assuming the facts alleged are true, the plaintiff has stated "a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In analyzing the sufficiency of the allegations, the Court must

ORDER ON DEFENDANTS' MOTION TO DISMISS - 10

"draw all reasonable inferences in favor of the plaintiff." *In re Tracht Gut, LLC*, 836 F.3d 1146, 1150 (9th Cir. 2016). The court may consider only the complaint, materials incorporated by reference in the complaint, and matters subject to judicial notice—all of which are construed "in the light most favorable to the non-moving party." *Cedar Point Nursery v. Shiroma*, 923 F.3d 524, 530 (9th Cir. 2019) (internal quotations omitted).

Defendants first argue that the Mutual Dissolution Agreement bars Craig's claims and, relatedly, that he fails to state a claim for rescission. Next, they contend that Craig fails to state a claim for unjust enrichment due to the existence of a written contract. Finally, Defendants challenge the sufficiency of the allegations supporting Craig's claims for securities fraud under state and federal law. The Court considers each argument in turn.

1. Settlement and release

An assertion that a release agreement bars claims asserted in litigation is an affirmative defense, which the defendant has the burden to plead and prove. *Perry v. Merit Sys. Prot. Bd.*, 582 U.S. 420, 435 n.9 (2017) ("In civil litigation, a release is an affirmative defense to a plaintiff's claim for relief, not something the plaintiff must anticipate and negate in her pleading."). Defendants' motion, however, simply assumes the existence of an enforceable release, relying on the fact that Plaintiff signed the Mutual Dissolution Agreement, which purports to release certain claims. Dkt. No. 14 at 3; *see also* Dkt. No. 1 at 68. But the agreement attached to the Complaint is only signed by Craig. Dkt. No. 1 at 68. And Defendants neither present a fully executed agreement nor claim to have countersigned the document—a rocky start to establishing the defense.

A defendant might nonetheless prevail on a motion to dismiss if the complaint contained allegations establishing the existence of an enforceable settlement. *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988–99 (9th Cir.), *opinion amended on denial of reh'g*, 275 F.3d 1187

(9th Cir. 2001) ("[A] plaintiff can … plead himself out of a claim by including … details contrary to his claims."). Here, however, the Complaint does not. To the contrary, Craig alleges he has no idea "whether Defendants even signed the Dissolution Agreement" and claims Defendants have acted as if no was agreement in place—for instance, by continuing to operate LAMP–WA despite the agreement's explicit provision that the company be dissolved no later than the end of 2024. Dkt. No. 1 ¶ 34; *id.* at 65. Further, the Complaint does not plead an oral release agreement (and Defendants do not claim such an agreement existed). *Cf. Valentine v. Metro. Life Ins. Co.*, No. 85 CIV. 3006 (CSH), 2005 WL 975919, at *3 (S.D.N.Y. Apr. 26, 2005) (holding that absence of a countersigned settlement agreement did not preclude enforcement because "[u]nder certain circumstances, oral settlement agreements are binding and enforceable").

Accordingly, Defendants have not carried their burden to show the existence of an enforceable release agreement barring Craig's claims.[5] The Court will reject their defense of release at this stage.

2. Rescission

Next, Defendants challenge the sufficiency of the allegations supporting Craig's claim for rescission of the Mutual Dissolution Agreement. The rescission claim is based on both fraudulent inducement and duress. While the Court finds that Craig adequately pleads duress, his fraud claim, as currently alleged, fails to meet the applicable heightened pleading standard.

---

[5] Moreover, the Mutual Dissolution Agreement signed by Craig expressly does not apply to claims arising after its effective date:

> [Craig] acknowledges and agrees that this dissolution represents a full and final settlement of all matters between the Parties [i.e., him and HQ]. [Craig] waives the right to bring any claims, disputes, or legal actions against Peterson LAMP HQ, LLC, its affiliates, or its representatives in connection with any matter *arising before the Effective Date of this Agreement*.

Dkt. No. 66–67 (emphasis added). Defendants suggest the release bars all of Craig's claims. Dkt. No. 14 at 4. But they fail to explain why it would apply, for instance, to Craig's claims challenging the nonpayment of commissions on deals that closed *after* he exited LAMP–WA.

ORDER ON DEFENDANTS' MOTION TO DISMISS - 12

Beginning with the fraudulent inducement claim, Federal Rule of Civil Procedure 9(b) requires plaintiffs to plead "with particularity the circumstances constituting" fraud. The Ninth Circuit has interpreted this requirement to mean that a plaintiff asserting fraud must allege "'the who, what, when, where, and how' of the misconduct charged." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (quoting *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997)). "Rule 9(b) does not allow a complaint to merely lump multiple defendants together but require[s] plaintiffs to differentiate their allegations when suing more than one defendant[.]" *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007). With respect to fraud allegations against a corporate defendant, like HQ, a plaintiff must typically "allege the names of the persons who made the allegedly fraudulent representations, their authority to speak, to whom they spoke, what they said or wrote, and when it was said or written." *Rosal v. First Fed. Bank of Cal.*, 671 F. Supp. 2d 1111, 1127 (N.D. Cal. 2009) (citation omitted). These requirements serve to "ensure that defendants accused of the conduct specified have adequate notice of what they are alleged to have done, so that they may defend against the accusations." *Concha v. London*, 62 F.3d 1493, 1502 (9th Cir. 1995).

To support his rescission claim, Craig points to two allegedly fraudulent statements. Dkt. No. 16 at 22. First, his Complaint alleges that "Defendants represented … that they needed to dissolve" LAMP–WA when, in fact, they continued operating the company. Dkt. No. 1 ¶ 31. Second, Craig alleges "Defendants agreed to" pay him "the Commissions that would be payable to [him] under the LAMP Commission Agreement and MP Commission Agreement, less any incidental costs that Defendants incurred at closing." *Id.* ¶ 45.

Neither allegation satisfies Rule 9(b)'s pleading standard. To begin, Craig cannot lump together Peterson and HQ without distinguishing which Defendant made the allegedly false statement. Allegations that "everyone did everything" are insufficient under Rule 9(b). *Destfino*

ORDER ON DEFENDANTS' MOTION TO DISMISS - 13

*v. Reiswig*, 630 F.3d 952, 958 (9th Cir. 2011).  Moreover, to the extent HQ—a corporate entity—is the alleged speaker, Craig fails to identify which HQ official actually spoke and what their authority was to do so on behalf of the company.  *See Rosal*, 671 F. Supp. 2d at 1127; *see also Radus Tek Servs., Inc. v. IDC Techs. Inc.*, 767 F. Supp. 3d 972, 981 n.3 (N.D. Cal. 2025) ("[M]erely attributing a misrepresentation to a corporate entity is inadequate; a specific person must be named, or at least identified." (quoting *Celebrity Chefs Tour, LLC v. Macy's, Inc.*, 16 F. Supp. 3d 1123, 1134 (S.D. Cal. 2014)).

The Court will therefore dismiss Craig's rescission claim to the extent it is predicated on fraud.  However, dismissal will be without prejudice to allow Craig to replead his allegations with the required specificity.

Craig also seeks rescission on the basis of duress, claiming that Defendants' threats to report him to the SEC or refuse to pay further commissions wrongfully coerced him into signing the agreement.  Neither party conducts a choice of law analysis.  Yet the parties apparently disagree (or are at least unsure) about which state's law governs the rescission claim.  *See* Dkt. No. 16 at 21–23 (applying Washington and Missouri law); Dkt. No. 14 at 11–12 (applying federal law from Federal Circuit decisions).  The Court need not decide which law to apply at this juncture because, under either Washington or Missouri law, Craig's allegations are sufficient to support a plausible inference of duress.

To establish duress under Washington law, a party to a contract must demonstrate that he was "deprived of his free will" by the "wrongful or oppressive conduct" of the other party.  *Retail Clerks Health & Welfare Tr. Funds v. Shopland Supermarket, Inc.*, 640 P.2d 1051, 1054 (Wash. 1982).  Mere "reluctance to accept" the agreement or "financial embarrassment" are insufficient.  *Id.*  The standard is similar under Missouri law:  "[A] contract obtained by so oppressing a person

ORDER ON DEFENDANTS' MOTION TO DISMISS - 14

by threats as to deprive him of the free exercise of his will may be avoided on the ground of duress[.]" *Wolf v. St. Louis Pub. Serv. Co.*, 357 S.W.2d 950, 954 (Mo. App. 1962).

At least at the motion to dismiss stage, Craig's allegation that Defendants threatened to report him to the SEC and "have him criminally investigated" based on "vague nonspecific wrongdoing" supports a plausible inference that the threat was wrongful and oppressive and had the effect of coercing him to sign the agreement. *See Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1242 (10th Cir. 1990) (vacating grant of summary judgment and finding triable issues of fact under Wyoming law as to whether defendant's threat to report plaintiff to the SEC "deprived [plaintiff] of its free will to resist entering into" a release agreement). Indeed, the Restatement (Second) of Contracts specifically identifies threats of "criminal prosecution" or "the use of civil process … made in bad faith" as examples of improper threats that may support a duress claim. Restatement (Second) of Contracts § 176 (1981). Whether or not Craig's duress argument will ultimately prevail at summary judgment or trial, his pleading is sufficient at this stage.

Accordingly, the Court will deny Defendants' motion to dismiss Craig's rescission claim to the extent predicated on duress.

3.  Unjust Enrichment

Defendants briefly argue that Craig's unjust enrichment claim is barred by the existence of a written agreement. Dkt. No. 14 at 12. They fail, however, to identify which written agreement purportedly forecloses Craig's claim. *Id.* In any event, Craig "is entitled to plead [his] claim of unjust enrichment in the alternative to [his] contract claim." *Fulltime Fantasy Sports, LLC v. Tedeschi*, No. C22-0295-JCC, 2022 WL 9354192, at *5 (W.D. Wash. Oct. 14, 2022) (citing Fed. R. Civ. P. 8(d)(2)).

The Court will deny Defendants' motion to dismiss the unjust enrichment claim.

ORDER ON DEFENDANTS' MOTION TO DISMISS - 15

4.  Securities Fraud

Craig's state and federal securities fraud claims allege that Defendants induced Craig to purchase and dissolve his units in LAMP–WA through various material misstatements. Defendants challenge the claims on two grounds: first, that the units in LAMP–WA were not "securities" under state or federal law and, second, that Craig has not met Rule 9(b)'s particularity requirement to plead fraud.  The Court agrees that Craig's allegations, as currently pled, do not show that the convertible preferred units in LAMP–WA were "securities."  The Court therefore dismisses the securities fraud claims without reaching Defendants' second argument.  However, because it is possible amendment could cure this deficiency, the Court will grant leave to amend.

Craig contends that his units in LAMP–WA were "securities" under the federal Securities Act of 1933 because they were "investment contracts."  Dkt. No. 16 at 24; Dkt. No. 1 ¶ 103 (citing 15 U.S.C. § 77b(a)(1)).  Under the test set out in *S.E.C. v. W.J. Howey Co.*, an "investment contract" requires three elements: (1) an investment of money, (2) in a common enterprise, (3) with an expectation of profits produced solely by the efforts of others.  328 U.S. 293, 298–99 (1946).  Washington courts also apply the *Howey* test "to determine the meaning of the term 'security' under the" Securities Act of Washington, which borrows the federal definition.  *State v. Argo*, 915 P.2d 1103, 1107 (Wash. Ct. App. 1996) (citing *Cellular Eng'g, Ltd. v. O'Neill*, 820 P.2d 941, 945–46 (Wash. 1991)) (applying the *Howey* test); *see also* Wash. Rev. Code § 21.20.005(17(a)).

Here, the parties contest *Howey*'s third prong—whether Craig's expectation of profits derived solely from the efforts of others.  The Ninth Circuit has held that the word "solely" in this context "should not be read as a strict or literal limitation" but must be "construed realistically, so as to include within the definition those schemes which involve in substance, if not form, securities."  *S.E.C. v. Glenn W. Turner Enters., Inc.* ("*Turner*"), 474 F.2d 476, 482 (9th Cir. 1973).

The fact that investors are "required to exert some efforts" does not "automatically preclude" the existence of an investment contract. *Id.* Rather, *Howey*'s third prong turns on "whether the efforts made by those other than the investor are the undeniably significant ones"—i.e., "those essential managerial efforts which affect the failure or success of the enterprise." *Id.*

In *Turner*, the Ninth Circuit's seminal case interpreting *Howey*'s third prong, the Court concluded that a pyramid scheme constituted the sale of "securities" despite requiring "some effort" by investors. *Id.* The investors there had purchased "plans" (or "Adventures") from an organization called Dare To Be Great ("Dare"), which entitled them to receive self-help materials and attend "business motivation" courses. *Id.* at 478. More importantly, the plans at issue enabled investors to earn commissions by inducing prospective purchasers (or "prospects") to buy plans and, thus, become part of the organization. *Id.* at 479. After buying into the scheme, an investor's role was to identify prospects and convince them to attend meetings at which Dare would conduct a sales pitch and pressure attendees to make a purchase. *Id.* at 479–80. The Court observed that the scheme required investors to "exert some efforts"—such as finding prospects, persuading them to attend meetings, and convincing some of them to buy plans. *Id.* at 482. But it was "the selling efforts of Dare" that generated the investors' expectation of profits. *Id.* In other words, their investment was in "Dare's get-rich-quick scheme" rather than the opportunity to earn commissions from their own work. *Id.*

The next year, in *Bitter v. Hoby's International, Inc.*, 498 F.2d 183 (9th Cir. 1974), the Ninth Circuit reached the opposite conclusion applying the *Howey* test to the sale of restaurant franchises. The plaintiffs there purchased franchise agreements that required them to meet strict operating standards "including standards for materials, merchandise, supplies," and other activities "as well as controls over hours of operation, advertisements, the painting of the building[,] and installation of vending machines." *Id.* at 184. Nevertheless, franchisees remained "responsible

for the day to day management and operation of [their] own" restaurants. *Id.* The Court distinguished *Turner* on the ground that the efforts required of the franchisees "were qualitatively more substantial" than the "slight efforts of the" investors in *Turner*. *Id.* at 184–85. Whereas the scheme's success in *Turner* "depended primarily upon the selling efforts of the [Dare] employees and distributors," the success of the restaurants depended on the franchisee's "continuous operation of the restaurant, production and sale of … sandwiches …, purchase of materials, merchandise[,] and supplies from sources selected at [the franchisee's] discretion, preparation of monthly operating statements, and employment of personnel to accomplish the foregoing." *Id.* at 185.

Although *Turner* and *Bitter* were resolved on summary judgment, courts have compared the facts of each case to allegations in a complaint when applying the *Howey* test on a motion to dismiss. *See Boldy v. McConnell's Fine Ice Creams, Inc.*, 904 F.2d 710 (9th Cir. 1990) (unpublished) (franchisees' active management of ice cream shops was more similar to plaintiffs' efforts in *Bitter* than the efforts in *Turner*); *Lytikainen v. Schaffer's Bridal LLC*, 409 F. Supp. 3d 767 (D. Ariz. 2019) (same as to plaintiff's management of bridal shop business in which he purchased a 50% stake).

While it is a close call, the Court cannot find that Craig's allegations support a plausible inference that he expected a return on his investment derived from the efforts of others when he purchased units in LAMP–WA. As currently pled, his efforts appear to have been more similar to the "substantial" activities in *Bitter* and more essential to earning a profit than the "slight efforts" of the investors in *Turner*. *Id.* at 185. For one thing, the Complaint does not allege any way that LAMP–WA made money except through business broker deals that Craig himself was responsible for closing. Craig alleges he was told his investment would unlock the opportunity to work as "the Marketing Partner" of LAMP–WA and that he would "work full time … pursuing customer leads"

ORDER ON DEFENDANTS' MOTION TO DISMISS - 18

and earn commissions on sales the company closed. Dkt. No. 1 ¶¶ 12–13. He alleges he expected to receive "no less than $500,000 per year" in commissions. *Id.* ¶ 13–15. He never alleges that anyone other than himself was responsible for closing deals or performing other tasks that would generate revenue for LAMP–WA.[6]

Unlike in *Turner*, Craig's allegations do not support that Defendants' selling efforts were central to LAMP–WA's success. Craig alleges that HQ promised to advertise the company and generate leads with King County clients. *Id.* ¶ 11. According to the Complaint, however, any such leads were forwarded to LAMP–WA "for [Craig] to work on" and "earn a [c]omission" from. *Id.* ¶ 17. While Craig alleges he worked "at the direction of HQ[,]" he offers no details about the nature of HQ's managerial contributions that might support a plausible inference that those efforts—rather than Craig's work securing deals—constituted the "essential managerial efforts" that "affect[ed] the failure or success of the enterprise." *Turner*, 474 F.2d at 482. It is perhaps possible that HQ's work generating leads and serving as "managing member" were central to LAMP–WA's profitability; but the Complaint must do more to explain how this was so to push Craig's claim over "the line between possibility and plausibility[.]" *Twombly*, 550 U.S. at 557.

The Court will nevertheless grant leave to amend so Craig can, if he chooses, attempt to add allegations showing that HQ's (or someone else's) efforts were, in fact, "the undeniably significant ones." *Turner*, 474 F.2d at 482. District courts will typically grant leave to amend unless "the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (en banc) (quoting *Doe v. United States*, 58 F.3d 484, 497

---

[6] At oral argument, Craig's counsel stated that Craig personally worked on only four of the ten pending business broker deals identified in the Complaint. *See* Dkt. No. 1 ¶ 27. The Complaint's allegation, however, is that Craig "secured the Company's position as a broker" on each of the "ten anonymized transactions" and that the commissions earned therefrom were "on behalf of Plaintiff's efforts[.]" *Id.* ¶¶ 27–28. Moreover, even if Craig did not actually work on all the pending leads, he still fails to allege that anyone else at LAMP–WA was responsible for doing so. The allegations simply do not explain how, if at all, LAMP–WA could earn revenue without Craig's efforts.

ORDER ON DEFENDANTS' MOTION TO DISMISS - 19

(9th Cir. 1995)).  Here, additional allegations might establish that the units Craig purchased in LAMP–WA constituted securities. While the complaint fails to show how LAMP–WA made money except through Craig's work, it does allege he was not an "officer, director, or manager." Dkt. No. 1 ¶ 25.  It also alleges that LAMP–WA's commissions were paid to HQ before being distributed to LAMP–WA and ultimately Craig.  *Id.* ¶¶ 13–14.  While these allegations, on their own, are not enough to show that Craig's expectation of profits derived from HQ's efforts—rather than his own—it is possible more detailed allegations about the enterprise would illuminate the significance of HQ's contribution and push Craig's claim over the line.

### III.  CONCLUSION

Accordingly, Defendants' motion to dismiss (Dkt. No. 14) is DENIED in part and GRANTED in part.  Craig's claim for rescission, to the extent predicated on fraud, and his claims for securities fraud under state and federal law are DISMISSED without prejudice and with leave to amend.   The motion is otherwise denied.  Craig shall file an amended complaint no later than February 17, 2026.

Dated this 27th day of January, 2026.

Kymberly K. Evanson
United States District Judge

ORDER ON DEFENDANTS' MOTION TO DISMISS - 20